**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| VINCENT LARA, | ) | |
| Plaintiff, | ) | Case Number 22-50014 |
| | ) | |
| v. | ) | |
| | ) | |
| ROCK VALLEY COLLEGE POLICE DEPT., | ) | |
| ROCK VALLEY COLLEGE, | ) | Jury Trial Demanded |
| ROCK VALLEY COLLEGE BOARD | ) | |
| OF TRUSTEES, in its official capacity, and | ) | |
| WINNEBAGO COUNTY SHERIFF'S DEPT., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

1.      This complaint is filed by Plaintiff Vincent Lara, former Police Officer with the Rock Valley College Police Department, and presently a First Sergeant in the U.S. Army Reserve ("1SG Lara" or "Lara"), against Defendant Rock Valley College and the Rock Valley College Board of Trustees, ("Rock Valley"), which oversees the Rock Valley College Police Department ("RVCPD" or "the Department"), alleging violations of the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301, *et seq.,* a Federal statute designed to protect military Reservists from retaliation, discrimination, harassment, and hostility in the workplace due to disruptions caused by military obligations (hereinafter "USERRA"). This complaint also avers a wrongful prosecution claim against all defendants, including defendant Winnebago County Sheriff's Department ("Winnebago County").

2.      Throughout 1SG Lara's employment with the RVCPD, he periodically was mobilized and performed duties pursuant to his status as a non-commissioned officer in the U.S. Army Reserve. When doing so, he requested and was granted leave pursuant to RVCPD policy.

3.       During 1SG Lara's tenure at the RVCPD, his supervisors became frustrated with the leave he was taking to accomplish his military duties. They became obsessed with whether 1SG Lara had volunteered for certain U.S. Army mobilizations, or had been ordered to perform those missions involuntarily. Such distinctions, however, do not exist in the federal USERRA or its Illinois state-law counterpart, the *Illinois Service Member Employment and Reemployment Rights Act*, 330 ILCS 61/1-1, *et. seq* (hereinafter "ISERRA").

4.       One of 1SG Lara's supervisors, police Sergeant Thomas Coe ("Coe"), unlawfully and impermissibly misused his authority as a sworn law enforcement officer to bring a bad-faith, contrived, and ultimately ill-fated criminal prosecution against 1SG Lara. The investigation and prosecution perpetrated by Coe was motivated by anti-military animus, and violated both USERRA and its equivalent under Illinois law entitling Lara to damages.

## JURISDICTION AND VENUE

5.       This Court has subject matter jurisdiction pursuant to 38 U.S.C. § 4323(b), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

6.       Venue is proper in this district under 38 U.S.C. § 4323(b) and 28 U.S.C. § 1391 (b)(2). Defendant Rock Valley College is a public entity in Rockford, Illinois, with its place of business in the district of this United States District Court, and a substantial part of the events giving rise to the claims in this action occurred in this district.

## PARTIES

7.       The Plaintiff, 1SG Lara, is the married father of two daughters who resides in Rockford, Illinois, and has resided there at all times relevant to this civil action.

8.       At all times relevant to this Complaint, 1SG Lara has been a member of the U.S. Army Reserve.

Judicial Complaint
*First Sergeant Vince Lara v. Rock Valley College Police Dept., et al.*
Page 2

9.      1SG Lara enlisted in the U.S. Army Reserve in 1999, with Military Police as his occupational specialty. He remains in the U.S. Army Reserve presently. Throughout his career he has served on multiple mobilizations.

10.     He served as a Team Leader at Chicago O'Hare Airport conducting security after the 9/11 attacks. Further, he served as a Team Leader and Squad Leader in Iraq from 2003-2005; while deployed on active duty to Iraq, he conducted Main Supply Route (MSR) / Alternate Supply Route (ASR) patrols, monitored Relay Stations, Listening Posts/Observation Posts, convoy security missions, transported enemy prisoners, and trained Iraqi police.

11.     For his combat service, the Army awarded him the Army Meritorious Unit Commendation Ribbon, Good Conduct Medal, Army Commendation Medal, Iraq Campaign Medal with three bronze campaign starts, the Armed Forces Reserve Component Medal with "M" Device, Combat Action Badge, and two combat shoulder patches.

12.     In addition to his military career, 1SG Lara also served with various police departments as a sworn law enforcement officer.

13.     He has served as a Patrol Officer with the Dubuque, Iowa Police Department (2010-2011). He served with the Rockford Park, Illinois District Police Department (2010-2014) (part-time). He served with the East Dundee, Illinois Police Department (2012-2014) (part-time). He served with the Winnebago Police Department (2014-2019) (part-time). He served with the Rock Valley College Police Department (2012-2017).

14.     Defendant Rock Valley College is a Community College in Rockford, Illinois.

15.     The Rock Valley College Police Department is a component of Rock Valley College.

## FACTUAL ALLEGATIONS

16.     In December 2012, 1SG Lara was hired by the RVCPD as a Patrol Officer, and remained employed in that position until October 2017.

17.     Throughout Lara's time at RVCPD, he remained active in the U.S. Army Reserve.

18.     When 1SG Lara first joined the RVCPD in 2012, he reported to Sergeant Brad Fleming.

19.     Shortly after 1SG Lara joined the department, Sergeant John Hoshaw became his first-line supervisor.

20.     Throughout 1SG Lara's tenure at RVCPD, his second-level supervisor was Sergeant Thomas Coe (Coe).

21.     Coe reported directly to the Chief of Police.

22.     When 1SG Lara began working for the RVCPD, he expected to serve two or three days per month on active duty with the U.S. Army Reserve, and participate in one annual training (AT) per year, and occasional Army-sponsored schools, which would last approximately two weeks.

23.     At all times 1SG Lara was on duty with the RVCPD, he performed his job satisfactorily.

24.     Throughout the years, 1SG Lara advanced in rank and was given more responsibilities within his U.S. Army Reserve unit.

25.     These promotions required him to work more than two to three days per month for the U.S. Army Reserve.

26.     Other officers at the RVCPD complained, and/or made sarcastic comments about the amount of time 1SG Lara was allowed to spend performing duty with the U.S. Army Reserve.

27.     Officer Michael Schoening complained to others within the RVCPD about the military leave 1SG Lara had been taking.

28.     At the time 1SG Lara spent serving with the U.S. Army Reserve increased, Coe became increasingly concerned with the time 1SG Lara was devoting to his U.S. Army duties.

29.     Coe literally expressed his anti-military animus toward 1SG Lara.

30.     On one occasion, Coe wrote, "there was a possibility that Officer Lara volunteered for an extra detail to take advantage of the military leave practice."

31.     To "take advantage" in this context connotes dishonesty, lack of integrity, and poor character.

32.     In September 2017, 1SG Lara provided to Coe and other supervisors at the RVCPD a letter from 1SG Lara's Company Commander, Captain ("CPT") Kevin Eisel, asking for cooperation in granting 1SG Lara leave to attend to his duties as a U.S. Army Reservist, and describing the rights provided to 1SG Lara under USERRA.

33.     The RVCPD was on notice of the obligations USERRA places on employers.

34.     The RVCPD was on notice of the rights military reserve personnel enjoy under USERRA.

35.     In September 2017, Coe, motivated by anti-military animus, coveted that 1SG Lara was making money through his performing duties with the U.S. Army Reserve.

36.     Military Reserve personnel are paid for their duties by law.

37.     Coe's concern ran so deep that he decided to take negative action against Lara and his military status, both in his capacity as 1SG Lara's supervisor, and as a sworn law enforcement officer.

38.     In approximately September 2017, Coe instructed Hoshaw, who was 1SG Lara's first-line supervisor, that he (Coe) would assume responsibilities for scheduling matters with respect to 1SG Lara.

39.     Coe's decision to assume direct supervisory responsibility over Lara was motivated by anti-military animus.

40.     Coe, who was 1SG Lara's supervisor, and also a sworn law enforcement officer, began a criminal investigation into whether 1SG Lara was mis-using leave, or otherwise acting improperly with respect to leave 1SG Lara requested from RVCPD.

41.     Coe initiated this investigation on his own.

42.     Coe questioned 1SG Lara about his requests for military leave.

43.     Coe's questions were accusatory and beyond that authorized by law.

44.     Coe's questions included whether 1SG Lara had volunteered for certain missions or deployments.

45.     In determining whether to accommodate a servicemember's orders, neither USERRA nor its Illinois equivalent take into consideration whether the servicemember volunteered for the mission or deployment.

46.     For a civilian public employer to question a member of the U.S. Army Reserve about whether he volunteered for military missions runs counter to the intent and purpose of USERRA.

47.     For a civilian public employer to question a member of the U.S. Army Reserve about missions or service violates the liberal construction mandate the Illinois Service  ISERRA requires to:

> [E]ffectuate the purposes and provisions of this Act for the benefit of the service member who has set aside civilian pursuits to serve his or her country or this State in a time of need. Such sacrifice benefits everyone but is made by relatively few.

330 ILCS 61/1-5(3).

48.     For a civilian public employer to question whether a member of the U.S. Army Reserve volunteered for a certain U.S. Army mission has a chilling effect on the propensity of the servicemember to accept certain missions or volunteer for those missions in support of his or her country.

49.     ISSERRA states: "[a] service member employee is not required to accommodate his or her employer's needs as to the timing, frequency, or duration of military leave." 330 ILCS 61/5-5(2).

50.     Coe, a public employee, was convinced that on some occasions 1SG Lara was being paid both by the RVCPD and the U.S. Army for the same duty day.

51.     Being paid by both the RVCPD and the U.S. Army for the same day did not violate the RVCPD's military leave policy, however.

52.     Being paid both by the RVCPD, a public employer, and the U.S. Army Reserve is actually required under ISERRA. *See, e.g.* 330 ILCS 61/5-10 ("Sec. 5-10. Additional benefits for public employee members of a reserve component. (a) ***Concurrent compensation*.**") (emphasis added); *see also* 330 ILCS 61/5-1 describing part of the Illinois General Assembly's intent as "ensuring that public entities are model employers of reserve components by providing additional benefits."

53.     As part of his investigation motivated by anti-military animus, Coe inquired about the military pay policy with a Rock Valley College payroll office employee named Kim Cain.

54.     Ms. Cain confirmed that there was no prohibition against military reservists receiving pay from Rock Valley College and from the U.S. military on the same day. Ms. Cain advised that this had been "the practice" for years.

55.     No provision of USERRA or its Illinois state law equivalent prohibits a public organization from paying an employee while that employee is performing duties as a reservist with the U.S. armed forces.

56.     Another concern Coe had regarding 1SG Lara's military duties involved a U.S. Army-sponsored event in the Washington, D.C. area known as the "Army Ten-Miler."

57.     Coe referred to the event as a "run/festival."

58.     Coe believed that the purpose for 1SG Lara to attend the Army Ten-Miler was to take a recreational trip with his family under the guise of legitimacy.

59.     Coe's belief was not based on facts or evidence.

60.     In reality, the "Army Ten-Miler" is the capstone event for an important conference that occurs annually in the national capital region and is sponsored by the U.S. Department of Defense Joint Task Force National Capital Region. It incorporates recruiting, public outreach, and promotes fitness and professionalism with the Army community. U.S. Army units from around the globe send representatives to support this event, which has been in existence since 1985. *See* www.armytenmiler.com.

61.     Ultimately, after questioning from Coe regarding the propriety of the trip to participate in the "Army Ten-Miler," 1SG Lara was able to have his military orders rescinded, and did not travel to or otherwise participate in the event as a direct result of workplace pressure from Coe.

62.     After assuming responsibility for reviewing 1SG Lara's requests for military leave, Coe focused on whether 1SG Lara had volunteered for certain U.S. Army Reserve mobilizations, and what the purpose of those mobilizations were.

63.     Coe scrutinized 1SG Lara's police leave and attendance records, his requests for military leave, and documentation 1SG Lara provided in support of his requests for military leave.

64.     On at least one occasion, Coe instructed 1SG Lara that he must inform Coe of any military duty 1SG Lara was volunteering to perform.

65.     On at least one occasion, Coe instructed 1SG Lara that he must not volunteer for military duty without first receiving permission from his supervisors at RVCPD.

66.     USERRA and its Illinois state law equivalent do not differentiate between duties that the servicemember volunteered to perform (many military units "ask for volunteers") versus duties the servicemember was involuntarily ordered to perform. For example, "[a] service member is not required to get permission from his or her employer for military leave." 330 ILCS 61/5-5(2).

67.     Neither USERRA nor its Illinois state law equivalent ISERRA requires a servicemember to seek permission from a public employer to participate in any U.S. Army Reserve duties, missions, deployments, or mobilizations.

68.     Occasionally there were errors and/or procedural missteps in the orders the U.S. Army issued to 1SG Lara in terms of his reporting date and time. For example, when 1SG Lara was required to report to his U.S. Army Reserve unit early on a Saturday morning, he would travel on the preceding Friday to ensure he was rested enough to perform his U.S. Army Reserve duties beginning early on Saturday. The drive from 1SG Lara's home to his duty station was approximately two hours. In addition, 1SG Lara's unit provided him lodging the Friday evening

preceding the Saturday on which duty began. The purpose was to ensure he was rested to perform his U.S. Army Reserve duties.

69. On these occasions, 1SG Lara would stay on a hotel located on Fort McCoy, Wisconsin.

70. Receipts from the hotel would appear as being issued from Sparta, Wisconsin.

**The RVCPD Initiates a Specious Law Enforcement Investigation against 1SG Lara**

71. Coe's anti-military animus with 1SG Lara's performing duty with the U.S. Army Reserve grew over time.

72. Coe misused the authority given to him as a law enforcement officer sworn to obey and uphold the law, to open a criminal investigation into whether 1SG Lara had been manipulating the RVCPD's "liberal military leave policy" for his own benefit, in essence, a larceny and false swearing investigation.

73. Coe wrote a formal police report, in his capacity as a sworn law enforcement officer, which included several references to Coe's concern about whether 1SG Lara had volunteered for certain missions, and the value of those missions on 1SG Lara's training or military readiness.

74. Coe also wrote about his concern that 1SG Lara had been taking three or four days of military leave per month, rather than the two days per month, Coe, and some non-military members may errantly expect of actual Reserve duties.

75. Coe wrote in his report:

> I felt that there was a possibility that Officer Lara volunteered for and [sic] extra detail to take advantage of the liberal military leave practice. It should be noted that Officer Lara is often getting three to four military leave days a month.

76.     The police report Coe authored was dozens of pages long, and scrutinized the records of 1SG Lara's requests for military leave going back to 2013. *Id*.

77.     On one occasion, on October 2, 2017, Coe took Sergeant Hoshaw with him on a trip to Fort Sheridan, Illinois, approximately 80 miles, and a 1.5-hour drive, to meet with CPT Eisel.

78.     The purpose of the meeting was for Coe to gather information as part of his investigation into 1SG Lara.

79.     During the meeting, which lasted over an hour, Coe asked pointed questions about 1SG Lara's U.S. Army Reserve schedule, asked to see various documents, and provided CPT Eisel documents to review.

80.     During the October 2, 2017 meeting, however, CPT Eisel did not express any concern that 1SG Lara was involved in any misconduct.

81.      During the October 2, 2017 meeting, CPT Eisel provided no documents or other evidence that would indicate that 1SG Lara engaged in any misconduct.

82.     During the October 2, 2017 meeting, Coe told CPT Eisel that on August 5, 2017, Coe had surveilled 1SG Lara and had video footage of 1SG Lara being on the Rock Valley College campus meeting with some unknown individual to buy a musical instrument for 1SG Lara's daughter. In the video, 1SG Lara was in his Army uniform.

83.     In fact, on August 5, 2017, 1SG Lara was in transit from his home to the location of his U.S. Army Reserve duty.

84.     With respect to 1SG Lara's wear of the U.S. Army uniform while on campus on August 5, 2017, there was nothing improper about his conduct.

85.     The fact that Coe brought up the August 5, 2017 interaction – and admitted that Coe had recorded 1SG Lara on video – further evidences Coe's anti-military animus.

86.     Coe's purpose for meeting with CPT Eisel was to collect evidence in support of Coe's criminal investigation of 1SG Lara.

87.     Coe expressly asked about the application of USERRA to 1SG Lara's situation, specifically with respect to time allotted for 1SG to rest between his shift with the RVCPD and the beginning of his U.S. Army Reserve duty.

88.     Coe was able to get CPT Eisel to opine that on at least one occasion under USERRA 1SG Lara would not be entitled to receive the day off prior to his duty with the U.S. Army because 1SG Lara lived less than 150 miles from his U.S. Army duty station.

89.     But, Coe did not advise CPT Eisel that 1SG Lara had been working the night shift at the RVCPD.

90.     Because 1SG Lara had been working the night shift at RCVPD, he should have been entitled to a period of rest before traveling to perform U.S. Army Reserve duty.

91.     Coe's practice of providing some facts to CPT Eisel, yet omitting salient facts (*e.g.*, about 1SG Lara working the night shift), further evidences Coe's anti-military animus, intent to cast 1SG Lara in a negative light in both the RVCPD and the U.S. Army Reserve, and develop a criminal case against 1SG Lara.

92.     Coe's anti-military animus enabled him to avoid reading the federal and state statutes he was sworn to uphold.

93.     Coe's anti-military animus confirmed his misplaced bias to conduct a lobsided rather than impartial investigation into a fellow sworn law enforcement officer.

94.     Coe's final report included material misrepresentations and mischaracterizations of Coe's interview with CPT Eisel.

95.     All of the misrepresentations were designed to cast 1SG Lara in a negative light with the RVCPD, with the U.S. Army Reserve, and with county prosecutors.

96.     Upon information and belief, before submitting his report, Coe did not have his report reviewed by the Rock Valley College General Counsel, the U.S. Department of Defense Employer Support of the Guard and Reserve, or the entity within the Illinois Attorney General's Office available for this very purpose, the ISERRA Advocate.

### First Sergeant Lara Resigns from the RVCPD

97.     On September 27, 2017, 1SG Lara approached Coe and advised that he (1SG Lara) was rescinding his request for military leave for October 5-6, 2017, for the "Army Ten-Miler" event discussed above. Coe initially ordered 1SG Lara to take vacation time for this event, even though it was an Army-sponsored event, and an event that various Army units from around the world frequently send servicemembers to support. Coe did not include this in the police report he eventually issued.

98.     Prior to September 27, 2017, Coe had admonished 1SG Lara repeatedly for requesting military leave for missions for which 1SG Lara had volunteered.

99.     Coe's admonishments were hostile and in violation of USERRA and ISSERA.

100.    The police report Coe issued referenced USERRA, but reflected Coe's impression that USERRA required the servicemember to take into consideration the employer's needs when requesting military leave. No such provision exists within USERRA.

101.    Prior to September 27, 2017, Coe had scrutinized 1SG Lara's time and attendance records, paying particular attention to 1SG Lara's military leave.

102.     On one occasion, Coe instructed 1SG Lara that he (1SG Lara) was insubordinate to Coe and to Sergeant Hoshaw by not checking with them prior to volunteering for a U.S. Army Reserve mission.

103.     Neither USERRA nor ISSERA obligates a public employee to check with management before Reserve duties.

104.     Lara has never been insubordinate in any aspect of his law enforcement or military career.

105.     On or about October 6, 2017, 1SG Lara met with Coe in Coe's office.

106.     Coe advised 1SG Lara that Coe had opened an investigation into 1SG Lara's military leave and that there would be a "compelled interrogation" of 1SG Lara, which would be conducted at a Rock Valley College conference room, would be conducted by an interrogator, would be recorded by a court reporter, and attended by a Rock Valley College attorney.

107.     Coe advised 1SG Lara that he would be compelled to answer questions pertaining to his attendance.

108.      Coe advised 1SG Lara that he could not lie and could not decline to answer the questions.

109.     Coe threatened 1SG Lara with being arrested and prosecuted, to the point that 1SG Lara was compelled to resign his position with RVCPD.

110.     After Coe made these threats against 1SG Lara, 1SG Lara verbally stated his intent to resign from the RVCPD.

111.     1SG Lara resigned as a direct result of the anti-military animus displayed against him by Coe, which was reinforced by RVCPD.

112.     1SG Lara resigned on October 6, 2017. 1SG Lara followed with a written statement indicating his intent to resign.

113.     Very shortly thereafter, 1SG Lara asked to rescind his resignation and Coe refused. Coe advised that 1SG Lara's request to attend the Army Ten-Miler appeared to be dishonest, and an unjustified request for military leave.

### The Unlawful Prosecution

114.     On October 18, 2017, Coe traveled to the Winnebago County Sheriff's Department Detective Bureau to provide details of the investigation Coe had conducted since September 2017 into 1SG Lara's requests for military leave.

115.     Coe provided a copy of the lengthy report he had compiled regarding 1SG Lara's leave requests.

116.     The Winnebago County Sheriff's Department relied on Coe's status as a sworn law enforcement officer in assessing the credibility of the report of misconduct he was providing.

117.     Coe advised that 1SG Lara had provided at least one "Fictitious Order" from 1SG Lara's unit regarding military duty to be performed in October 2017.

118.     No such "Fictitious Order" exists.

119.     In providing this information to the Winnebago County Sheriff's Office, Coe was untruthful, or at the very least demonstrated reckless disregard for the truth.

120.     Coe provided this information with the intent to convince the Winnebago County Sheriff's Office to pursue criminal charges against 1SG Lara, even after Lara had resigned.

121.     The Winnebago County Sheriff's Department did not conduct its own independent investigation into the alleged wrongdoing.

122.     The Winnebago County Sheriff's Department did not interview anyone in 1SG Lara's U.S. Army chain-of-command.

123.     The Winnebago County Sheriff's Department did not review any documents other than those provided by Coe.

124.     The Winnebago County Sheriff's Department obtained an arrest warrant for 1SG Lara, based on the information provided by Coe.

125.     On January 24, 2018, deputies from the Winnebago County Sheriff's Department executed an arrest warrant, charging 1SG Lara with theft by taking military leave from his job at the RVCPD when he purportedly was not on military orders.

126.     1SG Lara was notified of the arrest warrant by a detective from the Winnebago County Sheriff's Department via phone when he was picking up his daughters from school and before her first basketball game. 1SG Lara had come from the pistol range earlier that day, and had his weapons with him. He took his daughters to his spouse, secured his weapons at home, and then drove to the Winnebago County Sheriff's Department headquarters. He was placed in handcuffs and arrested in front of his peers.

127.     The probable cause to believe that Lara committed theft was the result of Coe's lop-sided investigation and misuse of his law enforcement authority in urging other law enforcement officers to arrest Lara.

128.     The criminal investigation and subsequent arrest of 1SG Lara were motivated by animus against 1SG Lara as a member of the U.S. Army Reserve.

129.     The allegations against 1SG Lara were concocted by Coe based on Coe's resentment of 1SG Lara's participation in the U.S. Army Reserve, which Coe perceived as distracting from 1SG Lara's duties at the RVCPD.

130.    1SG Lara committed no wrongdoing whatsoever.

131.    In fact, on May 5, 2019, the Division Security Manager and Chief Intelligence Officer of 1SG Lara's U.S. Army Reserve unit, a Colonel (O-6) with over thirty years of service, issued a memorandum confirming that there were no discrepancies between 1SG Lara's requests for time off with the RVCPD and the documentation of the U.S. Army Reserve duty 1SG Lara performed.

132.    The memorandum detailed the dates 1SG Lara had been present pursuant to military orders, from 2013 through 2017.

133.    In the memorandum, Colonel Rose concluded that "[g]iven the absence of any discrepancies between requests for time off from the RVCPD and documentation confirming Army Reserve duty performed, my initial and continued assessment is that the charges against 1SG Lara are unfounded."

134.    Coe never contacted Colonel Rose during Coe's biased investigation.

135.    Even after these allegations from Coe came to light, the U.S. Army recommended 1SG Lara for advancement within the U.S. Army Reserve where he was able to retain his continued Security Clearances.

136.    Coe's suspicions that 1SG Lara was violating the law and/or acted inappropriately ultimately proved to be meritless.

137.    On three separate occasions, 1SG Lara and his counsel were prepared to go to trial against the Winnebago County State's Attorney's Office so 1SG Lara could defend himself against the allegations against him.

## Resignations and Expungement of Arrest Record

138.    Shortly before the second scheduled trial date, in approximately Spring 2019, the RVCPD Chief of Police, Coe, and William Watson, who had been 1SG Lara's union representative, resigned.

139.    In approximately August 2019, before the third scheduled trial date, the Winnebago County State's Attorney's Office dismissed the case against 1SG Lara.

140.    On January 15, 2020, the Circuit Court of Winnebago County entered an order expunging records of Lara's arrest.

## Damages

141.    In September 2017, 1SG Lara had no other choice but to resign due to the discrimination, harassment, and hostility he faced at work and threats of further action – including prosecution -- orchestrated by Coe, and carried out by the Winnebago County Sheriff's Department and Winnebago County State's Attorney's Office.

142.    Because 1SG Lara resigned, he was deprived of the salary he otherwise would have been entitled to as an Officer with RVCPD.

143.    In addition, because of the legal proceedings leveled against 1SG Lara, he was prevented from being selected for at least one U.S. Army Reserve assignment that would have both enhanced his career and fulfilled the U.S. Army and would have entitled him to additional compensation.

144.    To defend himself with competent legal counsel throughout an investigation and three pending trials, he incurred legal fees, costs, and expenses that he could otherwise have used to provide for his spouse and children.

145.    He experienced extreme emotional distress.

## CLAIMS

### COUNT I:
### *USERRA -- Harassment Based on Military Status,*
### *against Rock Valley College Defendants*

146.     Plaintiff incorporates the allegations raised in paragraphs 1 through 145 above.

147.     USERRA prohibits discrimination and harassment in employment against individuals who have been called to duty in the uniformed service, and retaliation against those who avail themselves of the rights guaranteed to them by USERRA.

148.     Specifically, 38 U.S.C. § 4311 provides that an employee may not be denied a "benefit of employment" because of the employee's membership in the uniformed service.

149.     Congress intended the term "benefit of employment" to be interpreted expansively in order to support servicemembers and veterans, and should be liberally construed.

150.     USERRA proscribes harassment as a denial of a benefit of employment, to the same extent harassment is proscribed by other employment-related civil rights statutes.

151.     Defendants' treatment of 1SG Lara, as described above, which was based on animus against 1SG Lara because of his status as a servicemember, was so severe and/or pervasive as to adversely impact the conditions of 1SG Lara's employment.

152.     As a result of the Defendants' conduct, 1SG Lara suffered and continued to suffer damages, in that he has lost pay and benefits, lost employment opportunities, has suffered emotionally, and in that his reputation has suffered, causing further damages to his career.

### COUNT II:
### *USERRA -- Constructive Discharge, against Rock Valley College Defendants*

153.     Plaintiff incorporates the allegations raised in paragraphs 1 through 145 above.

154. Courts analyzing USERRA cases have recognized a claim for constructive discharge, *i.e.*, creating an environment hostile to the point that the employee is compelled to resign. "An assurance that employees cannot be fired on account of their military service is meaningless without assurance that the work environment will not be so intolerable that they will feel forced to quit." *See Dees v. Hyundai Motor Mfg. Ala., LLC*, 605 F. Supp. 2d 1220, 1227-28 (M.D. Ala. 2009).

155. 1SG Lara's September 2017 resignation was compelled by the Rock Valley College defendants' treatment of him, their direct attempts to defame him before his military superiors, and was based on 1SG Lara's status as a U.S. Army Reservist.

156. As a result of the Defendants' conduct, 1SG Lara suffered and continued to suffer damages, in that he has lost pay and benefits, lost employment opportunities, has suffered emotionally, and in that his reputation has suffered, causing further damages to his career.

## COUNT III:
### *Wrongful/Malicious Prosecution, against all Defendants*

157. Plaintiff incorporates the allegations raised in paragraphs 1 through 145 above.

158. The RVCPD, acting through Coe, initiated a baseless and irresponsible investigation and pursued a criminal prosecution against 1SG Lara.

159. The investigation and prosecution were motivated by animus against 1SG Lara, based on his taking military leave, and based upon his status as a U.S. Army Reservist.

160. The Winnebago County Sheriff's Department arrested 1SG Lara based on information provided by Coe.

161. The prosecution did not result in a conviction, all charges were dismissed, and the presiding court ultimately ordered records of the investigation and prosecution to be expunged.

162.    There was no probable cause and no reasonable grounds to bring the prosecution against 1SG Lara in the first place.

163.    1SG Lara suffered and continued to suffer damages as a result of the investigation and prosecution, in that he has lost pay and benefits, lost employment opportunities, has suffered emotionally, and in that his reputation has suffered, causing further damages to his career, and pain and suffering he and his family have had to endure.

### COUNT IV:
### *ISERRA -- Harassment Based on Military Status,*
### *against Rock Valley College Defendants*

164.    Plaintiff incorporates the allegations raised in paragraphs 1 through 145 above.

165.    ISERRA prohibits discrimination in employment against individuals who have been called to duty in the uniformed service, and retaliation against those who avail themselves of the rights guaranteed to them by ISERRA. *See* 330 ICLS 61/1-1.

166.    ISERRA incorporates the relevant protections of USERRA. *See* 330 ILCS 61/5-5.

167.    ISERRA proscribes harassment as a denial of a benefit of employment, to the same extent harassment is proscribed by other employment-related civil rights statutes.

168.    Defendants' treatment of 1SG Lara, as described above, which was based on animus against 1SG Lara because of his status as a servicemember, was so severe and/or pervasive as to adversely impact the conditions of 1SG Lara's employment.

169.    As a result of the Defendants' conduct, 1SG Lara suffered and continued to suffer damages, in that he has lost pay and benefits, lost employment opportunities, has suffered emotionally, and in that his reputation has suffered, causing further damages to his career.

## COUNT V:
### *USERRA -- Constructive Discharge, against Rock Valley College Defendants*

170.    Plaintiff incorporates the allegations raised in paragraphs 1 through 145 above.

171.    ISERRA prohibits discrimination in employment against individuals who have been called to duty in the uniformed service, and retaliation against those who avail themselves of the rights guaranteed to them by ISERRA. *See* 330 ICLS 61/1-1.

172.    ISERRA incorporates the relevant protections of USERRA. *See* 330 ILCS 61/5-5.

173.    ISERRA proscribes harassment as a denial of a benefit of employment, to the same extent harassment is proscribed by other employment-related civil rights statutes.

174.    1SG Lara's September 2017 resignation was compelled by the Rock Valley College defendants' mistreatment of him to the point that Lara was compelled to resign, and was based on 1SG Lara's status as a U.S. Army Reservist.

175.    As a result of the Defendants' conduct, 1SG Lara suffered and continued to suffer damages, in that he has lost pay and benefits, lost employment opportunities, has suffered emotionally, and in that his reputation has suffered, causing further damages to his career.

### **RELIEF SOUGHT**

WHEREFORE, Plaintiff Lara respectfully seeks that the Court order the following relief:

A.  Declaratory and injunctive relief requiring Defendants to implement policies against discriminating and retaliating against military service members, to include receiving available training from the Illinois Attorney General's ISSERA advocate.

B.  Compensatory damages, including but not limited to, back-pay and actual damages, loss of past and future earnings, loss of benefit time, emotional distress, damage to professional

reputation, humiliation, embarrassment, and pain and suffering, in an amount to be determined by a jury.

C.  Liquidated damages as authorized by USERRA

D.  An order requiring compliance pursuant to 38 U.S.C. § 4323(d)(1)(A).

E.  Costs of suit, inclusive of reasonable attorneys' fees, expert witness fees, and other litigation expenses.

F.  Such other and further relief as the Court may deem just and proper.

Dated: January 14, 2022

**/s/ John N. Maher**

John N. Maher
Illinois ARDC 6237599
MAHER LEGAL SERVICES PC
17171 71st Avenue
Tinley Park, Illinois 60477
Tel: (708) 468-8155
john@maherlegalservices.com

*Counsel for Plaintiff*